be appellate? Yes, your honor. You may proceed. May it please the court, this case presents an opportunity for the court to provide additional guidance to the district courts regarding the use of the deliberate ignorance instruction, the pattern jury instructions commentary regarding balancing good faith instructions and to discuss the error that arises when a district court approves of a deliberate ignorance instruction but refuses to grant the balancing good faith instruction. This is an actual knowledge case. The government tried it entirely on a theory of actual knowledge. This court has held that where the government relies on evidence of actual knowledge, the deliberate ignorance instruction is not appropriate. The government here picked its horse from the jump. From opening through its evidence at trial and through closing, it argued that Mr. Shoulders had actual knowledge. I can provide some record sites for the court and its staff later about those evidence and those arguments. We can end our argument there but I'll move on to why the deliberate ignorance instruction was improper. We need not focus on the first prong, subjective awareness of illegal activity, because the court has often recognized that evidence tending to show actual knowledge also tends to show a subjective awareness of illegality. But we do need to focus on the second prong, purposeful contrivance to avoid knowledge. In this case, everyone on the defense did what they were supposed to do. The defense objected to the deliberate ignorance instruction requested by the government. The defense offered limiting language to that instruction and also proposed a good faith instruction as contemplated in the commentary to the pattern jury instructions. And perhaps the government did what it was supposed to do also based on the court's case law regarding harmless error. We noted the court's statement on harmless error in our papers in United States v. Mendoza-Mendina from 2003, basically saying if it's error to give the instruction when the evidence does not support it, but it's always harmless when the instruction is given in error, it can never... Well counsel, does the government have to choose between an actual knowledge theory and a deliberate ignorance theory? They got to choose which one they're going to go forward on. They can't do both? Yes, your honor. Your answer is yes? That's what the government has to do? Yes, your honor. Where the government tries the case on an actual knowledge theory, the deliberate ignorance instruction is not appropriate. The court has held that... Are you familiar with United States v. Ragland, Fifth Circuit case? Your honor, I was citing United States v. Oti, which also cites United States v. Kurt. No, I'm saying, I'm asking if you're familiar with United States v. Ragland. I do not have that in front of me, your honor. Well apparently that case says the trial court may instruct the jury on deliberate ignorance even if the government proceeded on the theory that the defendant had actual knowledge of illegal activity. That's what I get from that case. And there are many cases where the district court has given the instruction sua sponte. This case is different because the government set out intentionally to try its case on actual knowledge, but then asked for the instruction. And I would propose that that was a felting suspenders approach, which the court has held shouldn't happen. Because the instruction tells the jury you can find actual knowledge or you can find that he should have known. And that is the standard. Well, I mean that's not... Look, I hear what you're saying. I think I wrote one of these cases a long time ago, and there is a danger here. As I understand it, the danger is, okay, we don't find enough evidence of knowledge, but we'll be able to backdoor that by saying, yeah, he probably shielded himself from knowing. So we get around actual knowledge of the deliberate ignorance. So I agree with you that there's a difficulty. But, you know, what Judge Graves is saying is that in some cases there's going to be evidence of actual knowledge. Okay, so maybe the government can try to prove that. But why can't the government say, look, the defendant is going to be saying, well, I didn't really know. But there's also evidence that he deliberately sought not to know. So we could do that too. Why can't the government do that? Well, it could, but in this case, Your Honor, we contend that the second prong was not met. Okay. The same evidence cited by the government... And what is the second prong again? Sorry. Purposeful contrivance to avoid knowledge of illegality. Okay, and so the danger... Tell me the case. I know you say this is the case where that danger is manifest. Because explain to me, when is the danger? If we're going to tell the district court something, don't do this in this circumstance, how are we going to articulate that to the district court so that maybe you think this... Some people say this instruction is being used too much, right? It should be rare, but it's being used too much. So how are we going to tell the district courts when not to use it? I think that probably the Pattern Jury Instruction Committee took that step in 2019 when it added language, the commentary, which is not but it's a suggestion based on what the committee sees in trends for cases by saying, if the deliberate ignorance instruction is given, the court should also consider a balancing good faith instruction. And that's like telling the jury, okay, you can have actual knowledge, you can find that he stuck his head in the sand. But if you find that there's evidence that the defendant had a good faith, honest belief, then that's a defense. Also, let us point out in the instruction that the government's burden is not lessened when there is a deliberate ignorance issue. Now, you proposed a good faith instruction here, the district court refused to give it. Remind me, did the district court explain why? No. At record 3910 to 3913 at the charge conference, there was some discussion between the court and the law clerk. The court initially thought that the defense asked for the deliberate ignorance instruction. The defense said, no, that was, we did not. We objected to it. And we also offered good faith. And then the district court said, your objections are all overruled, now you have a record and nothing further. And the deliberate ignorance instruction that was given does not mention recklessness. It notes that the jury could find that the defendant had knowledge of a fact if they found that the defendant deliberately closed his eyes to what would have been otherwise obvious, but that the jury could not convict based on conduct that was negligent, careless, careless, or foolish. That doesn't address recklessness. And I think that in that sense, the good faith... How does recklessness come into it, in your opinion? Well, it's a standard that's lesser than knowing and willful. And so you have one instruction here telling the jury it's not good enough if he's dumb or negligent, but it doesn't tell the jury specifically also, even if he's reckless. He's, Katie, bar the door, I'm going to bill all these claims. No matter what, they could not convict based on a reckless standard. It still has to be knowing and intentional. What, forgive me, I don't remember your argument on this. Your argument is that if all you could prove is recklessness, that's not enough to meet the deliberate ignorance standard? No, that wasn't my argument. That was just, I was commenting on the deliberate ignorance instruction that was given here. Our argument is that the second prong was not met, purposeful contrivance. And in fact, the government cited the same evidence in its response brief and all the way back to the trial, evidence that it contended showed actual knowledge the government is now saying shows purposeful contrivance to avoid knowledge. And it can't be both. It has to be one or the other. The government has pointed to selectively obtaining information from some marketers as purposeful contrivance. But the evidence below shows that Mr. Shoulders obtained information from the distributors of products, from marketers of both products. He sought out information when he received a trade association statement about using amniotic fluid injections. And below the argument was Mr. Shoulders selectively talked to these marketers and not these other marketers because they were going to tell him what he wanted to hear. So he knew, he knew that he would hear, that he would get the information he wanted. And that shows that he knows that the scheme is in play. Just by way of information, are both of these products amniotic fluid products, the one that's okay on the code and the one that's not okay? Yes, Your Honor. There's two amniotic fluids. One is Celgenuity. That is the cheaper one. And it is stored at, it is stored frozen. It has to be unfrozen to inject. The other one is fluid flow. That's the more expensive one that has a code. Where's the, where's the, where does So you can treat this with, you can treat tissue problems with amniotic fluid. Yes. And that was one of the issues in the trial, Your Honor. Apparently there, there is, there was some evidence that Medicare only approved of using this for wound and eye care, but not pain. So one prong was the government said, Mr. Shoulders should not use this for pain management in his patients. And then the other type of fraud the government contended was billing for the more expensive product when purchasing and administering the cheaper product. He was administering Celgenuity and billing it as if that was the flow. Yes. And the government alleged that he knew that's what he was doing. They did allege that. And so you're saying because of that allegation, they ought to be excluded from, from, from any evidence or making any allegation that he deliberately was unknowing about some other things. Well, Your Honor, we think that the second prong was not met because the government bases its, its argument on the second prong on seeking out this information from the marketers. But the evidence in the case was that private insurers paid for this. The FDA told consumers, don't, don't use this. Don't get this treatment outside of clinical trials. But Medicare had a cue code that approved of it and paid for it when people did get the treatments. The manufacturer of the cheaper product told its potential customers that it was seeking a cue code, but that it had not been given yet. But at the time of trial, the application for the cue code had not been denied. And the, the marketer for one of the products testified that there was a lot of confusion in 2020 and 2021 about the amniotic products. But the government presented all of these things as evidence that Mr. Shoulders masterminded this agreement. So what we have here is, is a case that's tried on actual knowledge. And I'll give you that Mr. Shoulders' arguments were that there was confusing information out there at the time, that maybe he didn't understand that the, the products were, were different, but the purposeful contrivance is still not there. You can't have the same evidence showing actual knowledge argued below and also showing purposeful contrivance. So I'll ask the, I guess the obvious question we've already touched on a little bit is, let's say you're right about that. There wasn't enough evidence to support giving the instruction because of the second prong. Why, tell me why it's not harmless error? The problem is, do we presume that the jury convicted on the actual knowledge theory, or do we presume that the jury was told, oh, here, you can have actual knowledge, you can have deliberate ignorance. And so do we presume that that information exists in a vacuum when the jury is deliberating? That's what the court has found that, that it is harmful to give the instruction in the past. And here we contend that there would have been a dichotomy between conviction on actual knowledge and a conviction and acquittal based on the evidence, were it not for the giving of this instruction, potentially. And if the court wants to provide more information, more clarity to the district courts in the future, then it could, say, use the balancing instruction. So you're saying one of the problems is you don't know whether he was convicted on actual knowledge or deliberate ignorance. Well, when the jury has an instruction that sort of waters down the burden of proof or changes it, I don't see how it can be harmless when we have to presume that the jury convicted based on actual knowledge. You said we have to presume that? No, we don't have to presume. We cannot presume that they convicted on actual knowledge when they had another route on which to convict based on the instruction. So couldn't you have given a special interrogatory to the jury to ask that very question? Yes. Did you ask for one? I don't believe the defense did below that. To touch briefly on my sufficiency argument, our best case for the sufficiency argument is United States v. Ghanji, 880 F. 3rd, 760. Much like this case, the government presented 17 witnesses in Ghanji. They presented 18 here. The conspiracy was based on concert of action, and the court has held that the government can establish this element through circumstantial evidence, but it is not to be lightly inferred. That mere similarity of conduct is not sufficient to prove an agreement, and I see that my time is up. All right. Thank you, counsel. Thank you. I love these little lights. I haven't seen these little lights. It's nice. I don't even notice it. Ms. Pryor, you may proceed. May it please the court, Lindsay Pryor for the United States. The district court did not abuse its discretion in issuing a deliberate ignorance instruction, and that is because the trial evidence showed both of the required prompts for the instruction. First, that Shoulders was subjectively aware of a high probability that billing Medicare for injections of cell genuity was illegal, and second, that he consciously avoided confirming that fact. As the experienced district court who heard all the evidence summarize to Shoulders that his sentencing, I have to consider what I see as a sort of willful blindness on your part, as you use those codes and you build for stuff that in your heart knew wasn't right. The argument, as I understand it from Ms. Knight, was the evidence of actual knowledge and the evidence of the contrivance not to know were the same. And that's a problem, I think. And that would be a problem. So what is your response to that? The evidence was not the same. So there is evidence of actual knowledge that would also overlap with the first prompt. With the first prompt, I can see that. Yes, I can see that. So then the evidence of purposeful contrivance, the purposeful contrivance to avoid learning of illegal conduct is the conscious action by the defendant to avoid learning of what would otherwise have been obvious. And there are a few very clear ways that Mr. Shoulders did that here. And the first is by selectively getting all the information he had about the Q code and the Medicare billing from marketers who would tell him the information he wanted to hear. So he got cover for what he wanted to do, even as he was consciously ignoring reliable and accurate information that if he had further investigated would have. So I'm going to deliberately seek out kind of fuzzy information that'll give me some kind of cover. Give me an example of that in the record. An example of that is his constant texts with the fluid flow marketer. There was one, there was a marketer named Morgan Chenoweth who testified. Shoulders texted her throughout the scheme starting in the fall of 2020 when he's asking, hey, are other providers billing under the Q code? Have there been any Medicare audits? I want to see some EOBs. So he wanted to find out if other people were doing this and if Medicare was reimbursing. Not so he could have cover to know if he could do it. They stop the billings when the ASIP alert comes out, which was the alert from the Professional Association for Pay Management Providers. Then you really see more of the purposeful contrivance that spring when he restarts his texts to the marketers. He says, hey, you still doing fluid flow? He says, is this all from Uncle Sam? That's exhibit 81. Then in October of 2021, he says, I just want to make sure the Q code is still working. And then the next month he asks Chenoweth that fluid flows are coming back wanting additional information. Have your Medicare's been audited? What is the difference between these two products? I understand one, obviously cell genuity is a lot cheaper because that's the whole idea on getting reimbursed at a higher rate. It's cheaper. Well, what's the difference? So they're both amniotic fluid products. What's the difference between the two? They were packaged differently. They were made by different companies. Yep. One was the one that they were using was frozen and the more expensive one was frozen. And then the more expensive one was sold at room temperature. Are they, are they sore? Where do you get amniotic fluid to treat this? It's just, that's just news to me. It was, so it was a regenerative medicine product, similar to stem cells, other biological products. They, they were sold by two different companies. Fluid flow was made by a company called BioLab and they had applied for and received a Q code for Medicare to bill, to, for, to get reimbursed in very specific instances of using that product. But that code never covered cell genuity in there. And, and there was evidence that Mr. Shoulders was aware of that. So he's constantly getting his information from, from getting information from people who are going to tell him what he wanted to hear. Even though all the marketers and salespeople who testified at trial said that a medical provider should not rely on marketer sales reps to, and that they would be expected to conduct their own research on Medicare billing. So Todd Dyer, who was the rep who sold the cell genuity said as a salesperson, he tries to educate himself, but he leaves it up to the physicians and healthcare providers know more about billing Medicare. This was even at trial, this was Shoulders' contention that he acknowledged, this is where I got my information. So his, he said, I was, I was confused about the Medicare billing rules, but in opening, he says the ASIP alert came out and there was a pause because he looked at it, Dr. Menzies looked at it and said, wait a minute, what's going on here? But what happened? The marketers continued to promote the amniotes. And as the case agent testified at trial, Shoulders was very industrious in finding the answers to things he wanted to find answers for, and this was not that cryptically difficult. Do you know whether the jury convicted him of actual knowledge or deliberate ignorance? The, the deliberate ignorance instruction gave the jury a particular way to infer that he knew. So because there was evidence to support both prongs, when there is evidence on both prongs, that is, the government has to prove knowledge and the willful blindness, his, the evidence that he is deliberately blinding himself gives the jury another, gives the jury a particular way of finding that based on that circumstantial evidence. And then to address Mr. Shoulders' argument, this is somehow an either or, but if the government argues actual knowledge, the deliberate ignorance instruction is improper. And that's just, that's just not the case. It's not an either or. The court has consistently said when there is evidence to support both prongs and there's a factual basis, the instruction is proper. And it has affirmed the deliberate ignorance instruction in cases even where there is overwhelming evidence of actual, of actual knowledge. You, I, another case example of that is Gibson. Maybe I missed the answer to my question. My question was just, do you know whether the jury convicted him of actual knowledge or deliberate ignorance? The answer to that is no, Your Honor. We don't, we don't know. I don't see how you can know that. But because the, the evidence that would show actual knowledge can also overlap with the first prong. The, the jury, and this goes to the harmlessness point, the court, the government didn't even mention the deliberate ignorance instruction at closing. So the argument was that Shoulders knew his conduct was improper and evidence certainly would support a finding of that. Can you give me an example of cases where, a case where giving this instruction would be a problem, the deliberate ignorance? Because, I mean, we've said that it should be given rarely, I think. Probably the commentary says it ought to be given rarely because you don't want to, you don't want it back to a way of proving actual knowledge if there's not, if there's not proof of that, right? So give, when would it, when would there be a case where it shouldn't be given? So an example of that would be Ariza Jacobo, which was a drug trafficking case where the court found there, because there was no evidence on that second prong of purposeful contrivance, and the issue was whether the defendant knew the bag he was border contained meth or not. And so all the court had in that instance is, all you have is evidence on the first prong. So there's suspicious circumstances from which the jury could infer he either knew or was at least subjectively aware of a high probability. So we said in that case it was error, but it was harmless. In that case it was error, it was harmless. And in that case... Good decision, right? Because I wrote it, so... That's right. That's a good one. Just kidding, just kidding. You don't have to agree with me. And the, but the danger, that case clarifies that the danger is that when there is no evidence on the second prong, so all you have is evidence of knowledge and then inaction or ignoring red flags, that's not enough. That's when you run the risk of getting, of getting, lowering the menstruator. But when you have the conscious, deliberate action, like Shilvers did here, when he's seeking the information that he wants to hear, he's, he's avoiding, when even at the same time that he could have looked into, his billing coordinator testified if she had questions about how billing, how billing care works, if she could have googled it, she could have looked at the code manual, she could have looked, there were plenty of rules and testimony. The FDA had publicly advised consumers at that point not to use anything purported to be a regenerative medicine product, or that those were all experimental and investigational. It's well known Medicare does not cover experimental or invest, investigational procedures, which is what Shilvers was doing using this for pain management purposes. So all of that is evidence of purposeful contrivance. He also did receive very direct warnings that his conduct was illegal, which I want to clarify because there's, there's a misunderstanding in the briefing about whether Shilvers received a direct warning from employee, an employee about what he was doing was illegal. And he did. So Amanda Petroff, who is his billing coordinator, testified that in the fall of 2020, she went to Shilvers and told him, I do not believe this is a billable code for the reason he's using it for. And Shilvers said, the rep said it's covered, so we're going to do it. And then she testified, I think we were both getting frustrated. He didn't want to hear what I had to say. And I felt as if I wasn't being heard. So not only is that a direct warning from an employee, but that is exactly the type of don't tell me, I don't want to know evidence that the court has said is a hallmark of the instruction. He also, he and the co-conspirators received that, that alert from, from ASIP in the fall of 2020 saying that amniotic fluid injections were not covered, despite the fact that marketers had been representing to the contrary. They paused the billings. And then as he acknowledged in his opening, once the marketers said, Hey, people are still doing this. Here's some billing information. They went ahead and restarted the scheme. And he actually also texted that alert to Ms. Petroff, his billing coordinator and said, can you call and tell me your thoughts? I just want to pulse check. And she said, it means all of that was direct warnings that his conduct was legal. The Trillers also says that the cases we cite only go to the first prong and not the second prong, which is just not accurate. We cite five fraudulent billing cases on purposeful contrivance. And all five have evidence that are similar to the types of scheme here and where the defense is similar in a billing scheme where the defendant is saying, I didn't understand. It was too confusing. Medicare is too confusing. But the evidence, the court did find similar evidence to support the second prong. So that's just not a depth reading of those cases. Even if the court does find that there was an error here, it was harmless. As I said, the government didn't rely on the deliberate ignorance instruction at closing. And there was significant evidence that the Trillers knew what he was doing was illegal. I'll just highlight a few of the clearest examples. So his communications from earlier in the scheme showed he knew that this was risky. When he first submitted the first claims, he texted saying, he's sweating on the reimbursements. He doesn't know if Medicare is going to reimburse. And then he sent a text back a few months later, I'm going to do as many as I can before Medicare decides not to pay. He emailed his billing staff excited and hopeful to learn that maybe Medicare would cover amnio. And then his billing supervisor testified she was shocked when the reimbursements came through because she hadn't found any information to support. Does the record reflect the difference in cost between the two products? Yes. So it was about, it might not be exact, it was $400 for an injection of cell genuity. That's the cost of practice. And then it was about $1,200 for fluid flow. So it was a big difference. So once Medicare paid on those first few reimbursements for, or reimbursed those first few injections of cell genuity, they immediately ramped it up. So they went from not billing any that, or just a few that August to I think 44 in September, 67 in October. Dozens of patients getting the same treatment before they stop in, stop when that alert comes out. And then there was strong evidence that Shoulders knew the product he was using was cell genuity, which never had a Q code. No one ever told him that that product, he could bill for Medicare for that product. In fact, it was Shoulders who told the rep who was selling it to him, Todd Dyer, that he should look into the Q code. He said, bro, this could be retirement early. You should look into this. All the information he got came from the fluid flow marketers. And then he routinely waived co-pays, which is the case agent testified is an indicator of fraud. So you'll agree that you could have a verdict convicting Mr. Shoulders where there was some jurors who thought he was guilty of deliberate ignorance, and others who thought he had actual knowledge. And you'd have a unanimous verdict, but for two different reasons. Yes, Your Honor, because it is not lowering the government's burden to prove that Shoulders that he knowingly did the fraud. Because you have the two prongs that are met, and you have this conscious avoidance to what would have otherwise been obvious, that allows the jury to infer knowledge based on that circumstantial evidence. Well, juror one might say, let's say juror one says they're back there deliberating. Oh, he knew. Juror two, well, I'm not sure that he actually knew, but he made sure that he couldn't know because he did these things to make sure that he didn't really know. But that was deliberate, so he knew. That's right. I don't know if I would say that it's inconsistent. It's two different ways of getting to he knew. That's right. They're not inconsistent because Shoulders either knew or he got the answers that he wanted from people who would give it to him so that he could put up a charade of ignorance if he was caught. He's saying he had cover to do it, which is what he did. I'll just briefly answer any questions the court has about the conspiracy claim. But the court's review is very deferential to the verdict in here. There was significant evidence, like we cite in our brief, particularly the communications between Shoulders and the co-conspirators. They're laughing about doing the amniotic fluid injections. They say, we need to discuss as a team how to proceed when that ACIP alert comes out. Unlike the cases that counsel referred to, there's evidence of communications between these people from which a jury could easily find that there was an agreement to defraud Medicare. You don't have to use all that time. And if the court has no further questions, I will ask a question. Thank you, count. Roboto. Thank you, your honor. I would propose that the charade of ignorance is actual knowledge. It's not deliberate ignorance. It's not a seeking out to avoid knowledge. There was information that after the trade association warning came out, Mr. Shoulders sought out info from the trade association who did not respond to him, which is the opposite of avoiding information, is seeking it out. I wanted to point out the times during the closing when the government contended that texting the fluid flow marketers and speaking only to the fluid flow marketers, 2008, 60, 65. The pattern instruction changed in 2019, and I'm presuming it changed for a reason. The commentary in the jury instruction cites your awesome case. That's not from that long ago. It's from 2019. And it proposes that a balancing instruction would state that the beyond a reasonable doubt that the knowledge elements of the crimes have been satisfied. And that's exactly what the defense asked for below, to make sure that the jury didn't convict based on two different types of knowledge or for a different reason. Finally, I wanted to point out the places in the record where the government just wrote its horse on actual knowledge the whole way. In opening at 2895 to 98, in trial 2975 to 77, 82 to 85, 3114 to 15, 3123, and in closing 4043 to 4083. And again, if the court wants to provide more clarity to the district courts on this issue, I think that this case provides a good opportunity for that. Thank you very much. Thank you. Thank you, counsel. This matter will be taken under revise.